UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

LUCIANO RUSSO, GEORGE MESSIHA,

*Plaintiffs,*

– against –

NATIONAL GRID, USA,

*Defendant.*

---

**MEMORANDUM & ORDER**
23-cv-03954 (NCM) (TAM)

**NATASHA C. MERLE**, United States District Judge:

Plaintiffs Luciano Russo and George Messiha bring this action against National Grid, USA ("National Grid") for failure to accommodate their disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107. In October 2025, the Court held a jury trial on plaintiffs' claims. *See* Minute Entries dated Oct. 6–10, 2025. The jury returned a verdict in favor of plaintiffs on each claim. *See* Verdict Sheet, ECF No. 98. Before the Court is defendant's motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. *See* Mem. in Supp. of Mot. for J. as a Matter of Law ("Mot."), ECF No. 96. For the reasons stated below, the motion is DENIED.

## BACKGROUND

The facts in this section are drawn from the parties' stipulation of facts contained in their joint proposed pretrial order ("JPTO") at ECF No. 67. *See* Stipulations ("Joint Stip."), ECF No. 67 at 18–19; *see also* Memorandum & Order, ECF No. 79. National Grid

1

is a gas utility company that provides natural gas for heat, water heating, and cooking to consumers in the New York City boroughs of Queens, Brooklyn, and Staten Island, and also consumers on Long Island, upstate New York, and Massachusetts. Joint Stip. ¶ 1. Plaintiff Luciano Russo was hired by National Grid in 2002 and became a dispatcher in 2013. Joint Stip. ¶ 6. Plaintiff George Messiha was hired by National Grid in 1993 and became a dispatcher in 2001. Joint Stip. ¶ 7. Dispatchers provide support for National Grid's field employees and outside agencies to facilitate responses to reports of suspected gas leaks in National Grid's gas system. Joint Stip. ¶ 10.

In March or April of 2020, National Grid assigned its dispatchers to work from home due to the COVID-19 pandemic, with the exception of supervisors, who were required to report in-person to dispatch centers to "retriev[e] leak calls from the printer." Joint Stip. ¶ 19. In 2022, National Grid required all dispatchers to return to in-person work on a full-time basis. Joint Stip. ¶ 20. Plaintiffs did not return to the office, and each requested a medical accommodation to work from home based on alleged disabilities. Joint Stip. ¶¶ 21–22. Defendant rejected both requests. Joint Stip. ¶ 23. Both plaintiffs remain employed by National Grid. Joint Stip. ¶ 24. Messiha returned to work on August 1, 2024, with an accommodation for parking, while Russo never returned to work. Joint Stip. ¶ 24.

On May 26, 2023, plaintiffs brought suit against defendant in the Eastern District of New York. *See* Compl., ECF No. 1. The Second Amended Complaint raises claims for defendant's failure to accommodate plaintiffs' disabilities in violation of the ADA, NYSHRL, and NYCHRL. *See* Second Am. Compl. ("SAC"), ECF No. 17. On December 20, 2024, the Court denied the parties' cross-motions for summary judgment. *See* Order on Motions for Summary Judgment ("Order"), ECF No. 56. Between October 6, 2025 and

2

October 10, 2025, the Court held a jury trial on plaintiffs' claims. *See* Minute Entries dated Oct. 6–10, 2025. Prior to submission of the case to the jury, defendant timely moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. *See* Mot. The Court did not rule on the motion and instead "submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). The jury returned a verdict in favor of plaintiffs on all claims. *See* Verdict Sheet.

Following the verdict, defendant timely renewed its motion for judgment as a matter of law. *See* Minute Entry dated Oct. 10, 2025; Fed. R. Civ. P. 50(b). Plaintiffs filed an opposition. *See* Mem. in Opp'n ("Opp'n"), ECF No. 101. Defendant filed a reply. *See* Reply, ECF No. 103. Plaintiffs then filed a letter objecting to the inclusion of a new request in defendant's Reply. *See* Mem. in Opp'n to the Extent that Reply Memo Seeks to Amend the Mot. ("Sur-Reply") at 1–2, ECF No. 105.[1]

## LEGAL STANDARD

Under Rule 50, a court may grant a motion for judgment as a matter of law only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017).[2] A party moving under Rule 50 "faces a high bar." *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 479 (2d Cir. 2001); *see also Ruderman v. L. Off. of Yuriy Prakhin, P.C.*, No. 19-cv-02987, 2024 WL 1952582, at *1 (E.D.N.Y. Mar. 28, 2024).

---

[1]   Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

[2]   Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

## DISCUSSION

### I.    Statutory Framework of the ADA

The ADA states that covered employers "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Furthermore, the ADA defines the word "disability" to mean either: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). In addition, major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

For much of the ADA's history, "[t]he definition of 'disability' under the ADA was . . . interpreted narrowly." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021). "In 2008, however, Congress passed the ADA Amendments Act (the 'ADAAA'), Pub. L. No. 110-325, 122 Stat. 3553, which broadened the definition of 'disability' under the ADA." *Id.*;

*see also Hernandez v. City of New York*, No. 11-cv-06644, 2015 WL 321830, at \*15 n.9 (S.D.N.Y. Jan. 23, 2015) ("By passing the [ADAAA], which went into effect on January 1, 2009, Congress significantly broadened the definition of 'disability' under the ADA."). The Second Circuit has noted that "the principal purpose of the ADAAA was to overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability . . . , and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton*, 3 F.4th at 92.

Congress provided "[r]ules of construction regarding the definition of disability" for courts to follow when adjudicating ADA claims. *See* 42 U.S.C. § 12102(4). Among other rules: (1) the "definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of" the statute; (2) the "term 'substantially limits' shall be interpreted consistently with the findings and purposes of the [ADAAA];" (3) an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active"; and (4) the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" such as medication, equipment, reasonable accommodations, or learned behavioral modifications. 42 U.S.C. § 12102(4).

The Equal Employment Opportunity Commission ("EEOC") has issued regulations interpreting the ADA and the statutory changes made by the ADAAA. *See* Regulations to Implement the Equal Employment Provisions of the ADA, 29 C.F.R. pt. 1630 (2026). These regulations are not binding on the Court, but it is proper for the Court to consider them as persuasive authority. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

5

Although the amended ADA does not define the term "physical or mental impairment," the regulations specify that the term means: "(1) [a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory . . . , digestive, genitourinary, . . . skin, and endocrine; or (2) [a]ny mental or psychological disorder, such as an intellectual disability . . . [or] emotional or mental illness." 29 C.F.R. § 1630.2(h).

The regulations also provide guidance on determining whether an impairment substantially limits an individual in a major life activity. 29 C.F.R. § 1630.2(j)(1). The regulations state that "[a]n impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Moreover, the regulations state that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*. The regulations note that "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv). They also explicitly state that in making this assessment, "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." *Id*. And significantly, the regulations specify that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate." 29 C.F.R. § 1630.2(j)(1)(v). Finally, the regulations

6

convey that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations" and "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

## II.   Plaintiffs' Claims under the ADA

At trial, plaintiffs held the burden of persuading the jury that they each had "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). Defendant raises three principal arguments that plaintiffs did not meet this burden. First, defendant argues that because plaintiffs did not offer any medical evidence, they did not establish that they were disabled within the meaning of the ADA. Mot. 3–7. Second, defendant argues that "[p]laintiffs have not identified any qualifying impairments within the meaning of the ADA." Mot. 8–9. Finally, defendant argues that, even if plaintiff had identified such impairments, plaintiffs "did not identify any major life activities impacted by their alleged impairments or prove that such major life activities were substantially limited." Mot. 9–11. The Court considers each argument.

### A.   Establishment of Disability

#### 1.   *Whether Medical Evidence is Always Required to Establish Disability*

Defendant's first argument is that plaintiffs did not offer medical evidence at trial to establish that they had disabilities, and accordingly, they cannot have established that they were disabled. *See* Mot. 4–5. Defendant asserts that "it is well-settled that [p]laintiffs must offer medical evidence in support of their alleged disabilities" and cites a district court case from 2003 that observed "[c]ourts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific

limitations to which he claims he is subject due to his condition, he cannot establish that he is disabled within the meaning of the ADA." Mot. 4 (quoting *Baerga v. Hosp. for Special Surgery*, No. 97-cv-00230, 2003 WL 22251294, at *6 (S.D.N.Y. 2003)).

This Court disagrees that the purported requirement to offer medical evidence to establish disability is "well-settled." Mot. 4. In fact, the predominate view taken by federal courts—particularly under the post-amendment ADA—is that medical evidence is not always required to establish disability, and whether medical evidence is necessary depends on whether the plaintiff's disability is one comprehensible to a lay juror (such as a plaintiff who can't see) or one that a lay juror cannot reasonably comprehend without the assistance of medical expertise (such as a plaintiff who suffers from a rare neurological disorder).

Neither the U.S. Supreme Court nor the Second Circuit Court of Appeals have given a complete answer to this question. However, three federal courts of appeals have ruled on the issue under the post-amendment ADA: the First Circuit, the Third Circuit, and the Tenth Circuit. Each has unanimously held that medical evidence is not always necessary to establish a disability under the ADA, and whether such evidence is required depends on how understandable the disability is to a lay juror. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 996–99 (10th Cir. 2019); *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 41 (1st Cir. 2018); *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 225 (3d Cir. 2024).

As the Tenth Circuit explains, "no language in the ADA or implementing regulations states that medical testimony is required, and there is certainly no general rule that medical testimony is always necessary to establish disability." *Tesone*, 942 F.3d at 996. Instead, in the Tenth Circuit's view, "whether medical evidence is necessary to support a disability discrimination claim is a determination that must be made on a case-by-case

basis." *Id*. When making this case-by-case judgment, "[c]ourts generally require expert evidence when a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition. *Id*. (citing *Mancini*, 909 F.3d at 41); *see also Katz v. City Metal Co. Inc.*, 87 F.3d 26, 31 n.4 ("[W]here it is not obvious to a lay jury that the condition affects one of the bodily systems listed in the regulations, expert testimony that it does may well be necessary to avoid a judgment as a matter of law."). On the other hand, "when a plaintiff alleges an impairment that a lay jury can fathom without expert guidance, courts generally do not require medical evidence to establish an ADA disability." *Tesone*, 942 F.3d at 997.

Some examples illustrate how courts have engaged in this case-by-case approach. The Tenth Circuit discusses a case where "the plaintiff claimed her employer refused to accommodate her avascular necrosis—a rare condition that can cause bone tissue to die from poor blood supply. But aside from her own declarations, the plaintiff offered no medical evidence to confirm her diagnosis. Because she lacked expert medical evidence of her condition, the district court granted summary judgment for the defendants." *Tesone*, 942 F.3d at 997 (discussing *Felkins v. City of Lakewood*, 774 F.3d 647, 648, 651 (10th Cir. 2014)). On appeal, the Tenth Circuit "explained that a lay witness is competent to testify concerning those physical injuries and conditions which are susceptible to observation by an ordinary person[,] . . . [but] where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts." *Tesone*, 942 F.3d at 997. In the Tenth Circuit's view, "avascular necrosis was beyond the realm of common experience and thus required the special skill and knowledge of an expert witness." *Id*.

By contrast, the First Circuit discussed a case where a plaintiff provided lay evidence that he had a "knee injury" but provided no medical evidence verifying or expounding on

9

this. *Mancini*, 909 F.3d at 41–42. The Court held "medical evidence was not required to establish that [plaintiff's] knee injury constituted an impairment" given that it was well within the province of a lay jury to understand. *Mancini*, 909 F.3d at 42. "On a spectrum that ranges from missing limbs to rare medical infirmities," the court explained, "some conditions plainly fall within the universe of impairments that a lay jury can fathom without expert guidance. These conditions do not require medical evidence in an ADA case." *Id.*

At least one district court within the Second Circuit has adopted the same view held by the First Circuit, Third Circuit, and Tenth Circuit. *See Zeltman v. Infinigy Sols., LLC*, No. 20-cv-00571, 2024 WL 3653800, at *3 (N.D.N.Y. Aug. 5, 2024). In *Zeltman*, plaintiff's injuries "allegedly caused back, neck, and shoulder pain" and the court found that "[p]laintiff is clearly capable of testifying about his injuries and how they have impacted one or more major life activities, as required to prove his claim." *Id.*

Although the Second Circuit has never fully addressed whether medical evidence is always necessary to establish a disability under the ADA, the Second Circuit has explicitly held that medical evidence is not always required to establish one of the elements of disability. As noted previously, the ADA's statutory text defines someone as disabled if they have "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). This definition can be broken into two elements: (1) whether the plaintiff has "a physical or mental impairment"; and (2) whether the impairment "substantially limits" a major life activity.

The Second Circuit held in *Rodriguez v. Village Green Realty, Inc.* that medical evidence is not always required to establish the second element of disability—that an impairment *substantially limits* a major life activity. 788 F.3d 31, 43 (2d Cir. 2015). This

10

holding is instructive for the instant case for two reasons. First, *Rodriguez* makes clear that medical evidence is not always needed for the "substantially limits" element of the definition of disability. Second, *Rodriguez* can serve as a guide for how to assess whether medical evidence is necessary to establish the first element of disability—whether the plaintiff has an impairment—though the Second Circuit did not address the question directly. As explained below, the logic that led the Second Circuit to hold that medical evidence is not always necessary to establish the "substantially limits" element indicates that medical evidence is not always necessary to establish the existence of a "physical or mental impairment," either.[3]

In *Rodriguez,* the Second Circuit "address[ed] the 1988 Amendments to the [Fair Housing Act ("FHA")], which extended the [FHA]'s protections against housing discrimination to disabled individuals." 788 F.3d at 40. The Second Circuit was "guided by [its] decisions interpreting similar language that appeared in the [ADA] prior to the ADA's amendment in 2008." *Id.*; *see also id.* at 40 n.10 (noting that the FHA's definition of "handicap" is virtually identical to the pre-2008 ADA's definition of "disability," so the Second Circuit interprets the FHA in line with the pre-amendment ADA).

The defendants in *Rodriguez* "argue[d] that this Circuit requires the submission of medical evidence to establish a disability under the FHA and that plaintiffs' claims fail for their failure to present admissible medical evidence." *Id.* at 43. The Second Circuit rejected that position. *Id.* The Second Circuit explained: "medical evidence as to the extent of an

---

[3]   The fact that the *Rodriguez* addresses the "substantially limits" element but does not address the other elements was recognized by *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 610 (S.D.N.Y. 2016) ("Although the Second Circuit has held that medical evidence is 'not always necessary' to establish that an impairment substantially limits major life activities, it has not ruled on whether such evidence is necessary to establish the existence of an impairment in the first instance.").

individual's impairment is not always required . . . . Neither the ADA or the FHA's text, nor the respective implementing regulations require medical evidence to establish . . . the impairment of a major life activity." *Id.* "Medical testimony may be helpful to show that an impairment is substantially limiting," the Second Circuit noted, "but it is not always necessary." *Id.*

Several aspects of *Rogriguez* lead the Court to believe that, similarly, medical evidence is not always required to establish the other element of disability. For one, the reasoning of *Rogriguez* was based on the fact that "neither the ADA or the FHA's text, nor the respective implementing regulations require medical evidence to establish . . . the impairment of a major life activity." *Id.* Likewise for the "physical or mental impairment" element, neither the ADA's text, nor its implementing regulations, state that medical evidence is always required. Second, the *Rodriguez* court came to its conclusion while interpreting the definition of disability under the narrower pre-amendment ADA. The amendments to the ADA only made it easier for plaintiffs to establish disability. Accordingly, given that medical evidence was not universally required for element (2) under the limited version of the statute, it is likely that medical evidence is not universally required for element (1)—a fairly comparable element—under the more expansive version of the statute.

Defendant's motion cites six cases to argue that medical evidence is required by courts in the Second Circuit. *See* Mot. 4. The Court is not persuaded by any of these citations. Defendant's first citation is a pre-amendment case issued in 2003. *See* Mot. 4 (citing *Baerga*, 2003 WL 22251294, at *6). That case held that "[p]laintiff's failure to provide medical documentation of his alleged sleeping difficulties renders his 'substantial limitation' showing insufficient as a matter of law." *Baerga*, 2003 WL 22251294, at *6.

12

This holding has been abrogated by *Rodriguez*, which held that "[m]edical testimony may be helpful to show that an impairment is substantially limiting, but it is not always necessary." 788 F.3d at 43. The second case defendant cites is *Heilweil v. Mount Sinai Hospital*, an earlier Second Circuit case from 1994. Mot. 4 (citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994)). However, *Rodriguez* explicitly discussed *Heilweil*, explaining that "[o]ur decision in *Heilweil* . . . is not to the contrary" and reading *Heilweil* to reflect the basic fact that "conclusory declarations are insufficient to raise a question of material fact." 788 F.3d at 44. The third case defendant cites, *Peterec-Tolino v. Com. Elec. Contractors, Inc.*, reasons that "[p]laintiff's failure to provide medical documentation of his asthma also undermines a claim of substantial limitation." No. 08-cv-00891, 2011 WL 5105474, at *6 (S.D.N.Y. Oct. 26, 2011). However, *Peterec-Tolino* cites exactly two cases for this proposition—*Baerga* and *Heilweil*—the former of which is likely no longer good law, and the latter of which the Second Circuit has characterized as consistent with *Rodriguez*'s holding that medical testimony is not always necessary, depending on the circumstances. The fourth case defendant cites, *Davis v. N.Y. State Off. of Mental Health*, echoes the same holding as *Baerga*—that "[p]laintiff's failure to provide medical documentation . . . renders his 'substantial limitation' showing insufficient as a matter of law"—which the Second Circuit has rejected. No. 05-cv-05599, 2009 WL 5178440, at *9 (E.D.N.Y. Dec. 31, 2009). Defendants' fifth case, *Levine v. Smithtown Cent. Sch. Dist.*, also takes the outdated view that the "[t]he absence of . . . medical evidence precludes a trier of fact from concluding that [plaintiff]'s impairment substantially limited a major life activity." 565 F. Supp. 2d 407, 425 (E.D.N.Y. 2008). Finally, defendant's sixth case, *Douglas v. Victor Capital Group*, decided in 1998, cites a litany of district court cases from the 1990s rejecting ADA claims where no medical evidence was provided to establish

13

disability. 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998). But *Douglas* and the cases it cites are substantially less persuasive than *Tesone, Mancini, Morgan,* especially given that each case from the 1990s was interpreting the pre-amendment ADA.[4]

Taking stock of the persuasive authorities available and the arguments raised by the parties, this Court holds that medical evidence is not necessarily required to establish that a plaintiff has a disability. Whether or not medical evidence is needed depends on whether the disability in question is one a lay jury can comprehend without expert medical guidance.

### 2. *Whether Medical Evidence Was Required in This Case*

While medical evidence may not always be required, the Court must address whether medical evidence was required *in this case*, either to establish that plaintiffs had an impairment or to establish that the impairment substantially limited a major life activity. The following sections discuss whether each plaintiff has satisfied each element of the definition of "disability," and as part of this analysis, the Court considers the necessity of medical evidence for each element and each plaintiff. *See infra* II.B–II.C.

### B. Whether Each Plaintiff Identified a Physical or Mental Impairment

The second argument defendant raises is that it was not reasonable for the jury to find either plaintiff disabled because neither plaintiff "identified any qualifying impairments within the meaning of the ADA." Mot. 8. Specifically, defendant argues that "[p]laintiffs did not identify any disorders or conditions from which they suffer by name" or establish "that they have been diagnosed with a disorder or condition at all." Mot. 8. Defendant states that plaintiffs offered only "self-serving descriptions of symptoms" but

---

[4]   The additional cases cited in defendant's Reply also do not persuade the Court otherwise. *See* Reply 6–8.

"without identifying any underlying physiological, psychological, or mental disorder, condition, or anatomical loss." Mot. 8. Defendant further argues that "symptoms standing alone and untethered to a diagnosed condition affecting a listed body system or a recognized mental disorder do not constitute a 'physical or mental impairment' under the ADA." Mot. 8. These arguments echo arguments also raised in the medical evidence portion of defendant's motion. *See, e.g.*, Mot. 5 ("Plaintiffs have neither identified the alleged disabilities with which they have been diagnosed (if any), nor have they presented any medical evidence from which a reasonable jury could conclude that they were disabled under the ADA . . . .").

### 1.    *Plaintiff Russo*

Russo provided testimony describing the condition that he contended was a disability. He described the condition as "a roller coaster of constipation and diarrhea that comes out of nowhere with little to no warning and . . . considerable to excruciating abdominal and rectal pain." Tr. 122:06–09. Russo also described it as "[a] classic roller coaster of constipation and diarrhea, causing me to stay in the bathroom for three-hours-plus a day at any time of the day out of the blue." Tr. 70:07–09. At one point, Russo was asked: "did your bowel movements and diarrhea and your bouts of having to spend hours in the bathroom, did that increase after 2020?", Tr. 71:24–72:01, and Russo testified "Yes." Tr. 72:02. Russo was also asked "[h]ow frequently were you utilizing the bathroom?", Tr. 72:03, to which Russo stated "To this day, it slowly and surely steadily increases. I might have slept an hour last night because of what happened with my digestive issues last night and this morning before coming here." Tr. 72:04–08. Plaintiff Russo was also asked: "How would you work at home if you were in the bathroom," Tr. 72:09–10, to which he responded that he works while sitting on the toilet: "I can bring a kitchen chair into my

15

bathroom, set it in front of my toilet, put the laptop on it, . . . plug it into the wall so it never loses charge. . . . I bring my company cell phone in there. . . . I'm logged into the landline phones in the office through . . . software. I bring pens and paper for writing notes or anything like that." Tr. 72:11–22.

Based on this evidence, the Court finds that Russo provided evidence that would permit a reasonable juror to conclude that he had a physical impairment. The EEOC regulations state that 'physical impairment' includes "[a]ny physiological disorder or condition . . . affecting one or more body systems." 29 C.F.R. § 1630.2(h). Russo testified that he has "constipation and diarrhea that comes out of nowhere with little to no warning," accompanied by abdominal and rectal pain, that results in him spending upwards of three hours using the bathroom. Tr. 122:06–09. The constipation and diarrhea that Russo testified about fit the EEOC's language of a "disorder or condition . . . affecting" a "body system[]." 29 C.F.R. § 1630.2(h).

The Court does not agree with defendant's argument that Russo's claim must fail because he did not "identify any disorders or conditions from which [he] suffer[s] by name." Mot. 8. While it is true that plaintiff did not introduce evidence establishing that he had a diagnosis such as "Irritable Bowel Syndrome," nothing in the statutory text suggests that a plaintiff must provide evidence that he or she has a specific named diagnosis with a specific medical term. For example, if an individual testifies that he cannot see, a reasonable jury is perfectly able to conclude that the individual is disabled. This is the case even if the condition is never given a name, whether it be a simple description of the principal symptom such as "blindness" or a specialized medical term reflecting a

16

medical diagnosis, such as "leber congenital amaurosis" or "Norrie disease" (rare disorders that can cause the complete inability to see).[5]

The Court also disagrees that Russo's claim must fail because he did not provide medical evidence. *See* Mot. 3–7. This is not an instance where a plaintiff provided evidence that he had "avascular necrosis" or another condition that would be opaque to a layperson. *See Tesone*, 942 F.3d at 997. Rather, any reasonable lay juror, drawing on their life experience, would be able to comprehend what it means to have "constipation and diarrhea that comes out of nowhere with little to no warning and . . . considerable to excruciating abdominal and rectal pain" that leads to "stay[ing] in the bathroom for three-hours-plus." Tr. 70:07–09; 122:06–09. This testimony falls within the "realm of common experience." *Tesone*, 942 F.3d at 997.

### 2.    *Plaintiff Messiha*

Messiha testified about two principal ailments, one mental and one physical. For one, Messiha testified that he "had numbness in my feet all the time." Tr. 230:16. *See also* Tr. 673 ("I was seeking to find out what's going on with me and the numbness in my feet that I had."). Second, Messiha testified that he was "suffering from panic attacks [and] insomnia." Tr. 229:14–15. Messiha was asked "can you describe, what do you mean by a panic attack? Describe the symptoms. You're not a doctor. Just tell us, what did it mean

---

[5]    Defendant argues that it is improper for a jury to find that a plaintiff disabled based on "a litany of possibly unrelated symptoms" without medical evidence showing that the symptoms in fact constitute a specific disability diagnosis. Mot. 5–6, 8. The Court does not agree. If a plaintiff testifies about multiple symptoms that are comprehensible to a lay person, it is not necessary for the jury to determine whether the symptoms stem from one cause or multiple. For example, if a person testifies that they cannot hear any sound, and also have daily seizures, the jury need not determine whether the two conditions arise from the same illness or from two unrelated illnesses in order to find that the plaintiff suffers from one or more impairments that substantially limit a major life activity.

17

for you?" Tr. 230:02–04. Messiha stated: "I could be sleeping, and I jump out of my bed, and I can't breathe and I have to run outside. Whatever I had on, I had to run outside to be able to breathe again." Tr. 230:05–07. Because of the panic attacks and the numbness in his feet, Messiha testified, "driving was very hard, focusing to drive was hard, walking was hard" and that with respect to driving, "I couldn't feel the pedal, the pedal of the brakes, the gas, nothing. The numbness was always there in my feet." Tr. 230:15–25.

Based on this evidence, the Court likewise finds that Messiha provided evidence that would permit a reasonable juror to conclude that he had a physical or mental impairment, or both. The EEOC regulations state that 'physical impairment' includes "[a]ny physiological disorder or condition . . . affecting one or more body systems" such as the "neurological" system or the "musculoskeletal" system or the "skin." 29 C.F.R. § 1630.2(h). Messiha testified that he had "numbness in my feet all the time" and that "[t]he numbness was always there in my feet." Tr. 230:16–17, 24–25. According to Messiha's testimony, what it felt like was the absence of the sensation of touch: that when driving, for instance, he "couldn't feel the pedal, the pedal of the brakes, the gas, nothing." Tr. 230:23–24. The "numbness" fits the EEOC's language of a "disorder or condition affecting" Messiha's feet, which are certainly part of a body system. 29 C.F.R. § 1630.2(h). Meanwhile, the EEOC regulations state that "mental impairment" includes "emotional or mental illness," *id.*, and Messiha's panic attacks appropriately fit.

The Court also finds that reasonable lay jurors were capable of comprehending Messiha's impairment or impairments without the presence of medical evidence. Numbness is a sensation that virtually every person is familiar with from their ordinary life experience. A lay juror can understand what it means that an individual had "numbness in my feet all the time" such that he could not feel the gas and break pedals of

18

a car when driving. Similarly, Messiha's testimony of having panic attacks, and specifically that: "I could be sleeping, and I jump out of my bed, and I can't breathe and I have to run outside . . . to be able to breathe again" describes Messiha's experience in comprehensible terms that reasonable lay jurors can understand.

### 3. Additional Arguments Concerning Trial Evidence

Defendant raises two additional arguments that the Court will address. First, defendant asserts that "[p]laintiffs premised their claims entirely on their own self-serving testimony regarding alleged symptoms they experienced . . . without introducing any corroborating medical records, clinical findings, or professional diagnoses." Mot. 5. Defendant's description of the testimony as "self-serving" does not move the needle. The fact that testimony is self-serving is simply a factor that the jury may consider in determining how much weight to afford the testimony. *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 620 (2d Cir. 1991) ("The fact that . . . testimony may be self-serving goes to its weight rather than its admissibility.") Moreover, there is no blanket rule that self-serving testimony must be corroborated by non-self-serving evidence. *See United States v. Brack*, No. 21-3077-cr, 2023 WL 3513572, at *2 n.2 (2d Cir. May 18, 2023) ("There is no requirement that a witness's sworn testimony be corroborated before it can be credited. Any lack of a corroboration for a witness's testimony—unless it is incredible on its face—goes merely to the weight of the evidence; the weight it is to be accorded is a matter for argument to the factfinder . . . ." (quoting *United States v. Norman*, 776 F.3d 67, 79 (2d Cir. 2015))).

Second, defendant suggests that plaintiffs' evidence is conclusory. The Court does not agree. Defendant cites language from a recent case, *Philbert v. New York City Department of Education*, that "simply providing conclusory statements is not enough to

support a finding that plaintiff is disabled within the meaning of the ADA." Mot. 5 (*quoting Philbert v. N.Y. City Dep't of Educ.*, No. 21-cv-03119, 2024 WL 756362 (S.D.N.Y. Feb. 23, 2024)). In *Philbert*, the plaintiff "submitted a declaration stating that her migraines cause 'visual and speech impairments, difficulty hearing, difficulty sleeping, concentration issues,' and more, and that they 'affect her in all aspects of her daily life and prevent her from living a full, fruitful life free from pain.' Plaintiff also state[d] that she 'constantly needs to be inside away from bright lights' and that she has 'trouble reading.'" *Philbert*, 2024 WL 756362, at *6. The *Philbert* court found these statements to be "conclusory" and "devoid of detail" and held that "simply providing conclusory statements that [p]laintiff is affected by her migraines is not enough to support a finding that she is disabled within the meaning of the ADA." *Id*.

Philbert does not change the Court's conclusion in the instant case. For one, the Second Circuit reviewed the *Philbert* decision and held that the district court erred by dismissing plaintiff's claim on the basis of insufficient detail because plaintiff was not, in fact, required to prove her disability at the summary judgment stage. *See Philbert v. New York City Dep't of Educ.*, No. 24-804, 2025 WL 3251187, at *1 (2d Cir. Nov. 21, 2025). More importantly, the Court finds that the evidence presented at trial by Russo and Messiha was not conclusory. Russo testified that he experienced "a roller coaster of constipation and diarrhea that comes out of nowhere with little to no warning and . . . considerable to excruciating abdominal and rectal pain," Tr. 122:06–09, which caused him "to stay in the bathroom for three-hours-plus" per day at unpredictable times and work with his laptop set up on a kitchen chair placed directly in front of the toilet. Tr. 70:07–09; 72:11–22. Messiha testified that he had "numbness in my feet all the time" and illustrated this with the specific example that, when he would drive, he "couldn't feel the pedal, the

pedal of the brakes, the gas, nothing. The numbness was always there in my feet." Tr. 230:16–17, 23–25. Messiha also testified that, when he would experience a panic attack, he "could be sleeping, and I jump out of my bed, and I can't breathe and I have to run outside . . . to be able to breathe again." Tr. 230:05–07. The Court finds that these allegations are not so "devoid of detail," *Philbert*, 2024 WL 756362, at *6, as to render Russo and Messiha's evidence purely conclusory.

      C.      <u>Whether Each Plaintiffs' Impairments Substantially Limited Major Life Activities</u>

Defendant next argues that even assuming that plaintiffs identified cognizable impairments, "[p]laintiffs did not identify any major life activities impacted by their alleged impairments or prove that such major life activities were substantially limited." Mot. 9. The Court disagrees. When Congress enacted the ADAAA, as the Second Circuit has noted, "the principal purpose [was] . . . to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton*, 3 F.4th at 92. The statutory text specifically states that the "definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of" the statute. 42 U.S.C. § 12102(4). Moreover, the regulations note that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

Plaintiff Russo provided evidence that his constipation, diarrhea, and abdominal and rectal pain constitute a "physical or mental impairment." *See supra* Section II.B. Moreover, the text of the ADA states that major life activities include "the operation of a major bodily function, including but not limited to . . . bowel . . . functions." 42 U.S.C. § 12102(2)(B). It was reasonable for the jury to conclude that Russo's "constipation and

diarrhea that comes out of nowhere with little to no warning" and that causes him "to stay in the bathroom for three-hours-plus a day at any time of the day out of the blue" constitutes a substantial limitation on the operation of his bowel functions. Furthermore, though Russo testified that his constipation and diarrhea are intermittent, the ADA states that an "impairment that is episodic . . . is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4). Thus, Russo may still be considered disabled even if his constipation and diarrhea only substantially impair his bowel functions when they are active. Accordingly, it was reasonable for the jury to conclude that Russo's impairment substantially limits a major life activity.

Plaintiff Messiha provided evidence that his panic attacks have interfered with his sleep and that he has suffered from insomnia. Tr. 229–30. Messiha also testified that because of his panic attacks and the numbness in his feet, "driving was very hard, focusing to drive was hard, [and] walking was hard." Tr. 230:15–16. Many courts have held that driving is not a "major life activity" under the ADA. *See Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 152 (E.D.N.Y. 2015) (collecting cases). But the ADA specifies that "major life activities include . . . sleeping [and] walking." 42 U.S.C. § 12102(2)(A); *see also id.* ("concentrating"). It was reasonable for the jury to conclude, based on the evidence presented at trial, that Messiha's impairments posed a substantial limitation on the major life activities of sleeping and walking.

Defendant argues that plaintiff must provide evidence of an impairment's frequency, severity, and duration. *See* Mot. 9–11. Even assuming that that is true, plaintiffs provided such evidence. Russo explained that his "constipation and diarrhea . . . comes out of nowhere with little to no warning," is accompanied by "considerable to excruciating abdominal and rectal pain," and causes him "to stay in the bathroom for three-hours-plus

22

a day." Tr. 70:08–09, 122:06–09; *see also* Tr. 72:03–08. Messiha testified that the numbness was "always" present in his feet and was of such severity that he could not feel the pedal of a car. Tr. 230:22–25. Moreover, Messiha illustrated the intensity of the panic attacks he suffered. *See, e.g.*, Tr. 230:05–07 ("I could be sleeping, and I jump out of my bed, and I can't breathe and I have to run outside . . . to be able to breathe again."). While Messiha did not give a numerical estimate of how often these panic attacks occurred, he confirmed that the panic attacks were "having an impact on [his] day-to-day life," Tr. 229:17–21, which a jury could reasonably interpret to bear on the frequency of the panic attacks. In sum, this testimony equipped the jury with sufficient facts to understand the characteristics of the impairments and the degree of limitation caused.

Lastly, the Court finds that medical evidence was not needed to establish the "substantial limitation" element for either Russo or Messiha. It is not unreasonable for a lay juror hearing the instant case without the benefit of medical evidence to conclude that Russo's bouts of constipation and diarrhea, that come out of nowhere and resulted in him using the restroom for over three hours, are a substantial limitation on the functioning of Russo's bowels. It is likewise not unreasonable for a lay juror hearing the instant case without the benefit of medical evidence to conclude that Messiha's panic attacks and numbness of his feet are substantial limitations on Messiha's sleeping and walking. A reasonable lay juror—drawing on their life experience, the testimony offered, and natural inferences they derive—can understand that constipation and diarrhea of the sort Russo described are substantial limits on the normal functioning of a person's bowels. This is within the "realm of common experience." *Tesone*, 942 F.3d at 997. Similarly, a reasonable lay juror drawing on the same things can understand that the panic attacks and foot

23

numbness that Messiha described are substantial limits on Messiha's sleeping and walking. This, too, is within the "realm of common experience." *Id.*

Defendant's reliance on *Zuppardo v. Suffolk County Vanderbilt Museum* does not change the Court's conclusion. *See* Mot. 5 (citing *Zuppardo v. Suffolk Cnty. Vanderbilt Museum*, 19 F. Supp. 2d 52, 56 (E.D.N.Y. 1998), *aff'd*, 173 F.3d 848 (2d Cir. 1999)). In *Zuppardo*, plaintiff argued he was disabled "because his ability to walk has been impaired by his leg and back conditions," but the court found that he had "failed to show that his walking was substantially limited by his leg and back conditions," because, among other reasons, plaintiff could still "walk some distances" and plaintiff provided no evidence that his impairments would have a "significant impact" on his ability to work. *Zuppardo*, 19 F. Supp. 2d at 55–56. The *Zuppardo* court reached this conclusion by analyzing three factors that were, at the time, codified in the EEOC's regulations. *See* 29 C.F.R. § 1630.2(j)(2) (1998). Those regulations called for considering: "(i) the nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact . . . [of] the impairment." *Id.* Following enactment of the ADAAA, however, the EEOC overhauled this regulation. The three factors relied upon by *Zuppardo* were abolished. *Compare* 29 C.F.R. § 1630.2 (1998), *with* 29 C.F.R. § 1630.2 (2026). Moreover, the regulations now specify that (1) "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting" and (2) "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is *lower* than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R.

24

§ 1630.2(j)(ii), (iv) (emphasis added). Accordingly, the Court finds *Zuppardo* of little relevance on this issue for evaluating claims brought under the post-amended ADA.[6]

    III.    <u>Plaintiffs' Claims under the NYSHRL and NYCHRL</u>

Defendant's Rule 50 motion also seeks judgment as a matter of law with respect to plaintiffs' NYSHRL and NYCHRL claims on the basis that plaintiffs did not offer medical evidence. Mot. 6. Defendant argues that "New York courts have dismissed disability discrimination claims under the even more expansive disability definitions afforded under the NYSHRL and the NYCHRL where plaintiffs failed to offer sufficient medical evidence of their alleged disabilities." Mot. 6. However, given that the Court has found that plaintiffs' claims survive under the ADA, there is little doubt they likewise survive under the more lenient standards of the NYSHRL and NYCHRL. *See Guerrero v. Constellation Health Servs.*, No. 22-cv-07736, 2026 WL 1078128, at *6 (E.D.N.Y. Apr. 21, 2026) ("Contrary to [d]efendants' position regarding [p]laintiff's lack of medical evidence, the text of the NYSHRL does not require [p]laintiff to substantiate her disability with medical evidence."); *see also* N.Y. Exec. Law § 292(21) (defining disability as "a physical, mental or medical impairment . . . which prevents the exercise of a normal bodily function *or* is demonstrable by medically accepted clinical or laboratory diagnostic techniques" (emphasis added)); *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 644 n.1 (2d Cir. 2021) (summary order) ("We have indicated that the definition of a disability under the NYSHRL and NYCHRL is broader than the ADA definition.").

---

6    Plaintiffs also argue that, regardless of whether they had impairments that substantially limited a major life activity, plaintiffs qualify as disabled under the ADA because defendant regarded them as disabled. *See* Opp'n 15. The Court disagrees. Plaintiffs chose not to litigate their case under this theory. For example, the jury instructions make no mention of regarded-as liability under the ADA. *See* Jury Instructions, ECF No. 97.

IV.     Failure to Engage in an Interactive Process and/or Cooperative Dialogue

Defendant asserts that "[p]laintiffs did not offer any evidence from which a reasonable juror could conclude that [defendant] failed to engage in the interactive process under the ADA and the NYSHRL, or the cooperative dialogue under the NYCHRL." Mot. 11. Defendant appears to be arguing that plaintiffs were required to show that defendant failed to engage in an interactive process and/or cooperative dialogue in order to establish its liability for failure to accommodate, and plaintiffs did not do so. This argument is without merit for two reasons. First, showing failure to engage in an interactive process/cooperative dialogue is not necessarily required to establish liability for failure to accommodate. Second, even if such a showing were required, a reasonable juror could conclude that it was made here.

"[T]he ADA contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). The term "interactive process" is not found in the text of the ADA, but rather stems from the regulations interpreting the term "reasonable accommodation." *See* 29 C.F.R. § 1630.2(o)(3). Those regulations state "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability . . . . This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Failure to engage in an interactive process is not, itself, an independent violation of the ADA. *Sheng v. M&TBank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017). However, "an employer's failure to engage in an interactive process" can be "evidence of discrimination under the ADA." *Id.* at 86

26

It is not necessary for the Court to reach the question of whether jurors heard sufficient evidence to conclude that defendant failed to engage in an interactive process. The question for the jury, in this aspect of the trial, was whether or not defendant made "reasonable accommodations" for the defendants. Indeed, the jury verdict sheet asked the jury to answer whether defendant failed to provide each plaintiff with a reasonable accommodation, not whether defendant failed to engage in an interactive process. *See* Verdict Sheet 1, 5. Whether defendant engaged in an interactive process may be relevant to the jury's determination of whether defendant failed to provide reasonable accommodations, but the two questions are not synonymous.

Moreover, it was reasonable for the jury to conclude that plaintiffs were not provided with reasonable accommodations. The jury heard evidence that plaintiffs were ultimately offered only a single accommodation—that plaintiffs could work from the company's Greenpoint location rather than the company's default location at 2 Hanson Place. *See, e.g.*, Tr. 79:16–17, 129:21–130:07, 284:04–06, 285:03–06; Pls' Trial Exs. 3, 7, 12. Furthermore, the jury received evidence that if plaintiffs did not return to work either with no accommodation or with the Greenpoint accommodation, they would face suspension followed by termination. *See, e.g.*, Pls' Trial Exs. 3, 7, 12. The jury also heard evidence that, for both plaintiffs, the Greenpoint accommodation would not address the issues posed by their disabilities, *see, e.g.*, Tr. 77:11–23, 79:14–15, 239:24–240:02, whereas at least one different accommodation—working from home—would, *see, e.g.*, Tr. 77:22–23, 226:18–227:06; Pls' Trial Ex. 4. The jury also concluded, in a finding not challenged by defendant in the instant motion, that the work-from-home accommodation would not impose an undue hardship on defendant. Verdict Sheet 2, 5. Together, this evidence was sufficient for a reasonable juror to conclude that defendant did not make

27

reasonable accommodations as required by the ADA, regardless of whether or not defendant engaged in an interactive process.

Even if it were necessary to address the question, defendant has not raised a persuasive argument that the jury lacked sufficient evidence to find that defendant failed to engage in an interactive process. At trial, the jury heard extensive testimony and received documentary evidence regarding what transpired between plaintiffs and defendant with respect to plaintiffs' disability accommodation requests. Defendant offers two principal arguments for why any reasonable juror had to conclude that defendant engaged in an interactive process based on this evidence. *See* Mot. 13. Neither argument moves the needle.

First, defendant notes that it reviewed and considered each of plaintiffs' work-from-home requests, spoke with plaintiffs about their requests, listened to their concerns, collected evidence regarding their disabilities, offered the Greenpoint location as an alternative accommodation, and offered reasons in writing for the denial of plaintiffs' work-from-home requests. Mot. 13. Many of these activities are consistent with engaging in an interactive process. *See Sheng*, 848 F.3d at 87 n.3 ("An employer engages in an interactive process by, for example, meeting with the employee who requests an accommodation, requesting information about the condition . . . , asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome."). However, an important component of the interactive process is the "identify[ing]" of "potential reasonable accommodations." 29 C.F.R. § 1630.2(o)(3). Even if an employer receives an employee's request and internally considers it, a reasonable juror could still find that the employer did not engage in an interactive process if the

28

employer refuses to budge from offering a single potential accommodation on a take-it-or-leave-it basis, especially after the employee has explained that the potential accommodation will not in fact accommodate the employee's disability. In the present case, after being informed by plaintiffs that Greenpoint accommodation would not address the limitations imposed by each plaintiff's disability, defendant did not proceed to identify any other potential reasonable accommodation or even engage in dialogue with plaintiffs about the possibility of non-Greenpoint options.

Second, defendant raises futility, alleging that "each Plaintiff admitted at trial that only one possible accommodation was acceptable – to be allowed to work from home – thus failing to engage in an interactive [process] . . . and rendering futile any further efforts by [d]efendant to find an alternate accommodation." Mot. 13. With respect to Messiha, defendant is presumably referring to the following testimony during cross examination:

> Q: And working from home was the only accommodation that you wanted, right? There was no other accommodation you would have accepted at that point, right?
> A: That's the only thing they offered me, was Greenpoint, which was further out from my house . . .
> Q: You didn't want to work at Greenpoint, right?
> A: I couldn't. It's further out from my house.
> Q: . . . And you didn't want to work at 2 Hanson Place, right?
> A: No
> Q: All right. So the only accommodation you wanted, again, was to work from home, right?
> A: Yeah, until I get better, yes.

Tr. 280:17–281:10. However, Messiha made clear that Greenpoint was the only accommodation ever discussed or offered by defendant. *See* Tr. 285:03–06 ("Q: Did anyone try to suggest anything other than going to Greenpoint? A: No."). Weighing the totality of the evidence, it was not unreasonable for the jury to conclude that defendant's failure to discuss or propose an accommodation aside from Greenpoint demonstrated its

failure to engage in the interactive process. Moreover, even though Messiha answered affirmatively to the question "So the only accommodation you wanted, again, was to work from home, right?", it was not unreasonable for the jury to conclude that this was Messiha's view in light of the options that plausibly seemed on the table: working from Hanson Place (the default); working from home (what Messiha had been doing for around two years); or working from Greenpoint (the sole alternative defendant offered).

With respect to Russo, defendant is likely referring to the following exchange:

> Q: . . . Your first request for an accommodation in 2022, to which the company responded with the Greenpoint backup dispatch center, was only related to your concerns about contracting COVID, right?
> A: That was, yeah.
> Q: You did not raise your gastrointestinal issues until after that accommodation was offered to you, right?
> A: Yes.
> Q: From then on, the only accommodation that was acceptable to you was to be able to work from your home, right?
> A: Yes.
> Q: And that's because you wanted access to a private bathroom, right?
> A: I don't want access to it; I need access to it.

Tr. 161:01–15. Presumably, defendant maintains that because "the only accommodation that was acceptable to [Russo] was to be able to work from [his] home," Tr. 161:09–12, that made "futile any further efforts by [d]efendant to find an alternate accommodation," Mot. 13. However, as with Messiha, a reasonable jury could have interpreted Russo's testimony to be that working from home was the only accommodation that was acceptable to him of the options that seemed plausibly on the table (Hanson Place, home, or Greenpoint) because home was the only option with a private bathroom. It would have been reasonable for the jury to interpret Russo's statement as reflecting what was acceptable to him among these particular options, rather than among all conceivable and

hypothetical possibilities. Bolstering this conclusion is that Russo was asked: "so when you were seeking accommodations in 2022 to continue to work from home after the Greenpoint dispatch center was offered to you as a backup, you communicated to people that you needed a personal and exclusive bathroom for only your use; is that right?" and Russo responded "I didn't say personal and exclusive. I said -- my wording was private bathroom." Tr. 165:01–07. Given that Russo "communicated to people that [he] needed . . . [a] private bathroom," it was not unreasonable for the jury to believe that Russo would have accepted an alternative that included a private bathroom had it been offered, and that it was defendant, not Russo, who failed to engage in the interactive process.

More broadly, even though the jury heard evidence that each party strongly preferred his or its own proposed solution, it was not unreasonable for the jury to attribute the breakdown of the interactive process to the defendant, rather than plaintiffs, because it was defendant alone who made the ultimatum that plaintiffs needed to either: (1) accept the Greenpoint accommodation (or no accommodation) by a specific date and time; or (2) face termination. *See* Pls' Trial Exs. 3, 7, 12. Moreover, it was not unreasonable for the jury to determine that plaintiffs did not themselves withdraw from discussions over a solution.

In sum, assuming it were necessary to reach the question, a reasonable juror could conclude that defendant failed to engage in an interactive process.

The Court reaches the same conclusion with respect to defendant's arguments concerning the NYSHRL and NYCHRL. The NYSHRL, like the ADA, contemplates that employers and employees will engage in an interactive process. *See Noel v. BNY-Mellon Corp.*, 514 F. App'x 9, 10 (2d Cir. 2013) (summary order). Unlike the ADA, the failure to engage in an interactive process is on its own an actionable violation under the NYSHRL. *See Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 302 n.16 (E.D.N.Y. 2013). The

31

NYCHRL, meanwhile, requires a "cooperative dialogue." N.Y.C. Admin. Code § 8-107(28)(a). This is "even more demanding than the interactive process standard." *Betances v. MetroPlus Health Plan, Inc.*, No. 20-cv-02967, 2021 WL 2853363, at *8 (S.D.N.Y. July 7, 2021) (citing *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102–03 (App. Div. 2020)). In the present case, the jury was not asked to consider an independent claim for failure to engage in an interactive process or cooperative dialogue under the NYSHRL and NYCHRL—rather, the jury was asked whether defendant failed to provide a reasonable accommodation under these statutes. *See* Verdict Sheet 1, 5. For the same reasons as with the ADA, defendant has not offered a meritorious argument regarding plaintiffs' reasonable accommodation claims under the NYSHRL and NYCHRL.

V.    New Arguments

Defendant's reply brief argues that "there was insufficient evidence . . . to have presented the question of punitive damages to the jury." Reply 14–15. This argument is new and was not mentioned in defendant's Rule 50(a) motion. Accordingly, this argument is waived. *See Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 615–16 (E.D.N.Y. 2020) ("Because a motion pursuant to Rule 50(b) is in reality a renewal of a motion pursuant to Rule 50(a), the grounds on which a party may rely in a Rule 50(b) motion are limited to those grounds that were specifically raised in the prior Rule 50(a) motion."); *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286–87 (2d Cir. 1998).

The reply brief also argues that plaintiffs "failed to present any evidence that establishes any nexus between their alleged disabilities, the duties and responsibilities of

32

their job, and the accommodations they requested." Reply 14. This argument was likewise not mentioned in defendant's Rule 50(a) motion. Although the Reply cites two pages of the original Motion, Reply 14 (citing Mot. 9–10), neither these pages nor any other portion of the Motion mentions this "nexus" argument. This argument is thus also waived.

**CONCLUSION**

For the foregoing reasons, defendant's Motion for Judgment as a Matter of Law under Rule 50 is DENIED. On or before June 29, 2026, defendant shall file a response to plaintiffs' Motion for Entry of Judgment, ECF No. 102. *See* Docket Entry dated Oct. 23, 2025.

**SO ORDERED.**

  */s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated:    May 28, 2026
          Brooklyn, New York